# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON REEL,<br><br>                                    Plaintiff,<br><br>v.<br><br>THE CITY OF EL CENTRO, et. al,<br><br>                                    Defendants. | Case No.:  22-cv-526-W-(KSC)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [DOC. 7] WITH LEAVE TO AMEND** |

Pending before the Court is a motion to dismiss for failure to state a claim brought by Defendants City of El Centro (the "City"), Chief of Police Brian Johnson ("Johnson"), and Marcela Piedra ("Piedra") (collectively, "Defendants") under Federal Rule of Civil Procedure 12(b)(6).  Plaintiff opposes the motion.

The Court decides the matter on the papers submitted and without oral argument. See Civ. L.R. 7.1(d.1).  For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion [Doc. 7] **WITH LEAVE TO AMEND**.

1

## I.   FACTUAL BACKGROUND

Plaintiff was employed as a Commander of the Police Department of defendant, City of El Centro (the "City").  (*Compl.* [Doc. 1] ¶ 1.)  Defendant Brian Johnson was Chief of Police. ¶ 3. Marcela Piedra was City Manager.  (*Compl.* ¶ 4.)  Both individuals are sued in their individual and official capacities. ¶¶ 3-4. Plaintiff believes Johnson and Piedra were involved in a personal relationship and conspired to deprive him of his constitutional rights.  (*Compl.* ¶ 4.)  From November 24, 2019, through the date of filing this lawsuit, Plaintiff either closed his investigations and/or had right to sue notices issued regarding all adverse employment actions.  (*Compl.* ¶ 8.)  On October 8, 2021, Plaintiff filed a claim for damages for retaliatory adverse employment actions resulting in his termination and received a rejection on October 27, 2021.  (*Compl.* ¶ 8.)

Plaintiff has served in law enforcement for 25 years with City.  (*Compl.* ¶ 9.)  In 2013, Reel was promoted to Commander, and was acting Executive Commander for 14 months.  (*Id.*)  Thereafter, he was the Commander directly under Executive Commander and the Chief of Police.  (*Id.*)  In 2021, Plaintiff's career came to an end after he was terminated following his report that Johnson was discriminating against female employees, retaliating against him for his reports, and had jeopardized the safety of police officers by not following Covid-19 protocols.  (*Compl.* ¶¶ 9.)  Plaintiff received awards, promotions, was an instructor/training officer, team leader of the SWAT team, led successful drug enforcement investigations and arrests.  He served as Acting Executive Commander. (*Compl.* ¶¶ 10-14.)  In July 2017, Alvaro Ramirez became official Executive Commander. In December 2017, Chief Eddie Madueno retired, during which time Ramirez was Acting Chief of Police.  (*Compl.* ¶ 16.)

In April 2018, Brian Johnson was hired as the new Chief, after serving only 2 ½ years as Chief of Upland Police Dept.  (*Compl.* ¶ 17.)  The City, by and through City Manager, Marcela Piedra, failed to perform a mandatory POST background check, as required by CCR Tit. 11§ 1953.  (*Compl.* ¶ 17.)  POST checks ensure the candidates are screened for their moral character, communication skills, interpersonal skills and

2

trustworthiness. (*Compl.* ¶ 17.) The City failed to administer a polygraph to Johnson. (*Compl.* ¶ 18.)   Had these measures been taken, the City would have discovered that Johnson had been forced to resign as Chief of Upland PD in Oct. 2017 due to a vote of no confidence by the Upland POA. (*Compl.* ¶ 18.)   The impetus was Johnson's retaliatory terminations of 29-year veteran Captain Anthony Yoakum and 23-year veteran Sgt. Marcus Simpson, after they reported Johnson's misconduct. (*Compl.* ¶ 18.) These officers had reported Johnson for violating officer safety protocols and for exposing Upland PD to liability for his illegal actions for false arrests at a marijuana dispensary. (*Compl.* ¶ 18.)   Plaintiff is informed and believes Johnson was reprimanded for his officer safety violations and other illegalities, which were placed in his personnel file. (*Compl.* ¶ 18.) A POST background check would have revealed a pattern and practice of retaliatory conduct unbecoming of the Chief of Police. (*Compl.* ¶ 18.) Both Yoakum and Simpson were falsely accused of misconduct after reporting Johnson's conduct and terminated. Both officers sued alleging numerous violations of their civil rights. (*Compl.* ¶ 19.) Further investigation would have shown that Johnson was at odds with nearly four-fifths of his officers who either resigned or were unfairly terminated, that he was out of step with the men and women he commanded, resulting in his forced resignation. (*Compl.* ¶¶ 19-20.)

At the time Johnson became Chief, the second in command was Executive Commander Ramirez, and there were two commanders, Reel and Robert Sawyer. (*Compl.* ¶ 21.)   Administrative staff assistant, Amanda Curiel, who had served under the prior two chiefs, was not serving under Johnson, and had worked with Plaintiff for several years. (*Compl.* ¶ 21.)   Initially, Johnson and Plaintiff got on well, with Johnson giving Reel the highest recommendation to attend the POST Command College Program. (*Compl.* ¶ 22.)

However, Plaintiff observed Johnson had an aggressive management style with a quick temper and often using foul and vulgar language. (*Compl.* ¶ 23.) Johnson's disrespectful treatment of women often caused the female staff to be left in tears.

3

(*Compl.* ¶ 23.)  When Plaintiff tried to make Johnson understand that female staff were upset by his demeaning and degrading comments, Johnson threatened Plaintiff by telling him that he was lucky he had made those comments in a closed-door meeting. (*Compl.* ¶ 23.)  Johnson's inappropriate conduct continued into 2019.  (*Compl.* ¶ 24.)  He yelled at Ms. Curiel, who submitted a budget request for training to him, yelling, "Aaron is fucking working for me, he needs to ask my permission" in front of other staff.  (*Compl.* ¶ 24.)  Plaintiff tried to get Johnson to apologize to Ms. Curiel.  (*Compl.* ¶ 24.)  There were several other instances where Plaintiff and staff witnessed Johnson verbally abuse Ms. Curiel.  (*Compl.* ¶ 24.)  In July 2019, Executive Commander Alvaro Ramirez abruptly resigned. Many staff members believe this was prompted by the hostile environment created by Johnson.  (*Compl.* ¶ 24.)

Matters came to a head on August 16, 2019, when Johnson accused Plaintiff of not apprising him of a school threat, which Plaintiff believed he had under control, and which in fact, turned out not to be a real threat.  (*Compl.* ¶ 25.)  Johnson screamed at Plaintiff, using the "f" word, and mocking him.  Johnson stated he would never promote Plaintiff to the Executive Commander position.  (*Compl.* ¶ 25.)  On August 16, 2019, Reel made a formal complaint against Johnson with the Director of HR based on Johnson's discriminatory conduct toward female employees, Johnson's hostility towards him, and Plaintiff's inability to work out a remedy with the Chief.  Plaintiff stated he feared retaliation.  (*Compl.* ¶ 26.)  The HR Director hired an outside investigator to investigate Plaintiff's claims.  (*Compl.* ¶ 26.)  On September 3, 2019, Johnson informed Reel that a decision had been made to change the Executive Commander position into a Deputy position that would serve at will without any due process protections.  (*Compl.* ¶ 27.)  Despite Johnson stating he would never promote Reel, he offered Reel the at-will position of Deputy Chief, which Plaintiff declined.  (*Compl.* ¶ 27.)  Plaintiff believes the offer was made so that he could be terminated without affording him due process. (*Compl.* ¶ 27.)

On September 19, 2019, Johnson violated Police Dept. policy by failing to place Plaintiff in the position of Acting Chief during Johnson's absence, with a 10% increase in pay. (*Compl.* ¶ 28.) Instead, Johnson selected Commander Ray Bonillas, who had only been in the position for less than a year, instead of Plaintiff, who had six years' seniority. (*Compl.* ¶ 28.) When Johnson returned on September 23, 2019, he informed Plaintiff that Officer Thompson had filed a complaint of unfair treatment against Plaintiff. (*Compl.* ¶ 28.) The complaint stated that Curiel and Reel were trying to undermine the Chief, that Reel was being "insubordinate to the Chief," when in fact there was an investigation as to the Chief's discriminatory and retaliatory animus toward Commander Reel and Curiel. (*Compl.* ¶ 28.) The Director of HR believed that Johnson was behind Thompson's allegations. (*Compl.* ¶ 28.)

Thompson had only been under Plaintiff's supervision for seventeen days when he made the complaint. (*Compl.* ¶ 29.) In addition, the City had settled the largest police misconduct and wrongful death settlement of $4.1 million in the history of the Southern District of California for the negligent supervision and training of Thompson. (*Compl.* ¶ 29.) Thompson had also been involved in a lawsuit in prior years for engaging in sexual harassment resulting in another million-dollar settlement. (*Compl.* ¶ 29.) Thompson had serious performance issues prior to being supervised by Reel, and the HR Director warned Johnson that he should review Thompson's personnel file prior to promoting him. (*Compl.* ¶ 29.) In fact, Johnson had encouraged Reel to issue Thompson a counseling memo for performance deficiencies on August 13, 2019, prior to Reel complaining about Johnson. (*Compl.* ¶ 29.) Johnson failed to include Plaintiff's 2-page list of accomplishments in his performance review for 2018-2019. (*Compl.* ¶ 30.)

On November 6, 2019, the investigator sustained two findings: 1) Johnson has used inappropriate language and raised his voice in the presence of subordinate employees in 2019 and 2) Johnson violated department policy concerning succession of command on Sept. 19, 2019. (*Compl.* ¶ 31.) Despite these sustained findings, no one informed Plaintiff of the results of the investigation. (*Compl.* ¶ 31.) Unbeknownst to

5

Plaintiff, Johnson was issued a reprimand in his personnel file. Reel was not immediately compensated for the loss of pay when deprived of the role of Acting Chief. (*Compl.* ¶ 31.)

After completing an audit, the California Commission on Police Officers and Training determined that City failed to perform a background investigation on Johnson, in violation of law, and was ordered to complete a POST background by December 20, 2019, or they would order him to resign. (*Compl.* ¶ 32.) The City and Johnson deliberately failed to obtain the appropriate background information, which would have demonstrated Johnson's pattern of retaliation to officers who engage in protected activity by reporting his illegal conduct. (*Compl.* ¶ 32.)

On November 25, 2019, Plaintiff filed a DFEH Complaint alleging Johnson's harassing conduct. (*Compl.* ¶ 33.) On November 28, 2019, Johnson went on vacation and again intentionally retaliated against Plaintiff by selecting the other junior commander, Ray Bonillas, for Acting Chief, in violation of Department policy. Plaintiff again reported this to HR. (*Compl.* ¶ 34.)

In further retaliation, in December 2019, Johnson deliberately changed Dept. policy, approved by Piedra, so the Chief now had discretion to choose the Commander he wished to be in charge in the event of his absence. (*Compl.* ¶ 35.) This was done intentionally to deprive Plaintiff of his rights and was in violation of the law. (*Compl.* ¶ 35.) On December 11, 2019, Plaintiff was informed by several of his direct reports that they had been interrogated by Johnson while Reel had been out taking care of one of his little girls, who was sick. (*Compl.* ¶ 36.) Johnson was trying to make an issue out of the detail regarding a Christmas parade in an attempt to find some fault with Reel while he was out of the office. (*Compl.* ¶ 36.) When Plaintiff returned to the office, Curiel informed Reel that "he needed to watch his back" because Johnson was after him. (*Compl.* ¶ 36.)

On December 11, 2019, Plaintiff complained to HR that the stress under Johnson had taken a toll. (*Compl.* ¶ 37.) Pursuant to instruction from the HR Director, Plaintiff

6

filed a W/C claim due to Johnson's discriminatory and retaliatory actions. Plaintiff had never had any treatment or symptoms prior to that time. (*Compl.* ¶ 38.)  On December 11, 2019, Plaintiff was placed on Ativan and sent for a psychological assessment. (*Compl.* ¶ 38.)  He was diagnosed with anxiety and depression and placed on medical leave. (*Compl.* ¶ 38.)

After returning from six and a half weeks of medical leave on January 27, 2020, Plaintiff learned that his office belongings had been packed and his office had been moved to a much smaller office next to the Chief's office.  (*Compl.* ¶ 39.)  Plaintiff was also stripped of all his previous job duties: field operations, SWAT, field training program and all areas related to police operations.  (*Compl.* ¶ 39.)  Johnson told him he was to assume the duties of "administrative" commander, which is the less attractive of assignments and usually given to the junior commander.  (*Compl.* ¶ 39.)  Plaintiff was shut out of important meetings and was informed that he would find out what his duties were once the new Deputy Chief was hired.  (*Compl.* ¶ 39.)   Johnson refused to meet with Plaintiff one on one.  (*Compl.* ¶ 39.)

On January 28, 2020, Plaintiff was finally informed that his original complaint had been sustained and he was entitled to the pay of Acting Chief that he had been deprived of.  (*Compl.* ¶ 40.)  Johnson still refused to pay Plaintiff.  (*Compl.* ¶ 40.)

On Feb. 11, 2020, Plaintiff received his PE from Johnson which was favorable and did not contain any deficiencies.  (*Compl.* ¶ 41.)  However, unbeknownst to Plaintiff, Johnson was re-hiring former Commander Robert Sawyer to fill the position of Deputy Chief to get rid of Plaintiff.  (*Compl.* ¶ 41.)  Johnson admitted this was his strategy to the Director of HR and other City management officials.  (*Compl.* ¶ 42.)  Prior to the arrival of Deputy Chief Sawyer, the HR Director informed Plaintiff that there were no sustained findings regarding Thompson's complaints. (*Compl.* ¶ 42.)  Johnson directly contacted the outside investigator and directed him to begin interviewing additional witnesses to compile derogatory information in order to build a case against Plaintiff.  (*Compl.* ¶ 42.)

7

Johnson directed Sawyer to collect any information against Reel which was condoned by Piedra. (*Compl.* ¶ 42.)

On March 13, 2020, City declared a state of emergency and Plaintiff took an active role as Planning Chief for the Emergency Operations Center. (*Compl.* ¶ 43.) During a command staff meeting on March 30, 2020, Plaintiff identified two police officers who met the criteria of high-risk individuals who should be protected from the risk of Covid-19. (*Compl.* ¶ 44.) When Plaintiff said that the two officers should be relieved of field duties, he received immediate pushback because it would strain staffing levels on patrol. (*Compl.* ¶ 44.) As a result, no one acted on his recommendation, and both officers tested positive for Covid-19. (*Compl.* ¶ 44.) Plaintiff was also concerned that the department did not have N-95 masks for its officers. (*Compl.* ¶ 44.) By May 27, 2020 one of the officers whom Plaintiff had identified was in critical condition. (*Compl.* ¶ 45.) The same day, Johnson instituted new safety protocols, which Plaintiff had been trying to implement since March. (*Compl.* ¶ 45.) On June 2, 2020, the officer was in grave condition. (*Compl.* ¶ 46.) Plaintiff went behind closed doors with Deputy Chief Sawyer and stated, "I f*ing told you this was going to happen." (*Compl.* ¶ 46.) The officer died the next day. (*Compl.* ¶ 46.)

Plaintiff sought legal advice as to his reporting his reasonable belief that Command Management had not properly protected the officer by removing him from the field. (*Compl.* ¶ 46.) At this point, Plaintiff was acting as a private citizen. (*Compl.* ¶ 46.)

Johnson humiliated plaintiff on June 8, 2020 during the transport of the officer's body from the mortuary. (*Compl.* ¶ 47.) Plaintiff reported this threat to HR Director and asked to meet with her. (*Compl.* ¶ 48.) On June 9, 2020, Plaintiff met with the HR director, who instructed plaintiff to put his complaints in writing. (*Compl.* ¶ 49.) The first complaint was for continuous retaliation and hostile environment due to earlier reports of Johnson's conduct and the second was for officer safety violations which

8

contributed to the deceased officer's contracting Covid-19. The complaints were turned in on June 15, 2020. (*Compl.* ¶ 49.)

On July 7, 2020, the HR Director notified Johnson of Plaintiff's complaints, Johnson went on the defensive, suggesting he intended to place plaintiff on administrative leave, but could not articulate any valid reasons for this action to the HR Director. (*Compl.* ¶ 50.) The HR Director so became aware that Johnson was falsely spreading information that the officer had requested to stay in the field, which his wife denied. (*Compl.* ¶ 50.)

On July 8, 2020, the HR Director asked plaintiff if there was a possibility to mediate the complaints. (*Compl.* ¶ 51.) Plaintiff said he was unsure if he could continue to work with Johnson due to the retaliation from Johnson. (*Compl.* ¶ 51.) On July 9, 2020, Reel was placed on administrative leave pending an investigation into potential misconduct and policy violations. (*Compl.* ¶ 51.) The City violated Gov. Code section 3303(c) by failing to properly notify Plaintiff of the allegations against him. (*Compl.* ¶ 51.) Johnson had made the complaint against Plaintiff but lied to plaintiff and stated it was due to another employee complaining against him. (*Compl.* ¶ 52.)

On July 10, 2020, Plaintiff followed up with DFEH regarding his 2019 complaint, and was notified it was still being investigated. (*Compl.* ¶ 53.) He also contacted DOL to file an OSHA complaint for them to investigate the lack of Covid-19 field protocols and death of the officer. (*Compl.* ¶ 53.)

On August 25, 2020, Johnson finally came up with false allegations against Plaintiff, which were based on interviews and collection of information of which he had no first-hand knowledge. (*Compl.* ¶ 54.) Johnson emailed his allegations to the HR Director. (*Compl.* ¶ 54.) The email contained allegations of dishonesty, false and misleading statements while on duty; insubordination, conduct unbecoming an officer and unprofessional behavior in violation of department and City policy, and an allegation that Plaintiff made a false complaint against Johnson. Also, Johnson inquired as to the status of Thompson's complaint. (*Compl.* ¶ 54.)

The City's response to Plaintiff's 2018 DFEH Complaint indicated that two findings were sustained against Johnson and that Reel was in the process of being paid for each time he was not designated acting Police Chief.  (*Compl.* ¶ 55.)  But Reel was not paid until October 2020.  (*Compl.* ¶ 55.)  The City Attorney also stated that City was investigating other complaints by Reel against Johnson for retaliation, but this was false as no investigation had started.  (*Compl.* ¶ 55.)  Rather, there was an investigation on Johnson's trumped-up false allegations regarding plaintiff's performance.  (*Compl.* ¶ 55.)

On September 18, 2020, while Plaintiff was on administrative leave pending investigation of Johnson's allegations, Plaintiff received a notice of intended disciplinary action—written reprimand and a 20-day suspension on Thompson's complaints which had been closed.  (*Compl.* ¶ 56.)  This disciplinary action was based on the earlier investigation that had been reopened by Johnson, who had gone behind the HR director's back and poisoned the investigation by adding new charges and witnesses that Plaintiff never had an opportunity to defend himself against.  (*Compl.* ¶ 56.)

On September 24, 20202, the City began an investigation through an outside investigator for what Plaintiff believed was for his two complaints regarding continual retaliation and officer safety violations.  (*Compl.* ¶ 57.)  Instead, the investigation focused on Johnson's unsupported allegations against Plaintiff regarding dishonesty, insubordination, and false complaints against Johnson.  (*Compl.* ¶ 57.)  As Johnson had done with the previous Thompson investigation, he manipulated and coerced his command staff to make false allegations and went to lunch with the investigation.  (*Compl.* ¶ 57.)  At no time were Plaintiff's complaints addressed during the investigation; it was one sided and none of Plaintiff's witnesses were interviewed.  (*Compl.* ¶ 57.)  The City also did not provide an independent investigation with a separate investigator regarding the continuous retaliation and the reporting of officer safety protocols.  (*Compl.* ¶ 57.)

10

On October 1, 2020, Mr. Reel contacted the Employee's Assistance Program for a face-to-face counseling referral for stress and anxiety. (*Compl.* ¶ 58.)  At an appointment with a counselor on October 9 he was diagnosed with generalized anxiety disorder. (*Compl.* ¶ 58.)

On November 24, 2020, the suspension was reduced to a 3-day suspension by the HR Director based on the lack of evidence and tainted investigation. (*Compl.* ¶ 59.) However, on February 1, 2021, Piedra, who had an intimate personal relationship with Defendant Johnson, reversed the HR Director's decision and reinstated the twenty-day suspension, resulting in a monetary loss of approximately $10,000.00 to Plaintiff. (*Compl.* ¶ 60.)

On February 11, 2021, Plaintiff received another notice of intended disciplinary action—termination from employment. (*Compl.* ¶ 61.)  The basis for this disciplinary action was that Plaintiff had violated ECPD's Policies and Procedures and the City's Personnel Rules and Regulation by engaging in: dishonesty regarding his medical restrictions and other reasons regarding a vehicle that had been on a removal from service list, insubordination for informing the Chief during the transport of the deceased officer that plaintiff did not know about the parking situation, and bringing false complaints about retaliation and regarding officer safety protocols not being followed for Covid-19 because that made the department look bad. (*Compl.* ¶ 61.)  Plaintiff contacted DFEH concerning this development and was told to file another complaint, which he did. (*Compl.* ¶ 61.)

Plaintiff appealed this notice through the Skelly process, and the HR Director was named as the Skelly Officer, a role she had never performed. (*Compl.* ¶ 62.)  While the Skelly process was pending, both the HR Director and the City Attorney disagreed with the decision to terminate Plaintiff because the reasons did not substantiate a termination of Plaintiff's twenty-five-year employment career. (*Compl.* ¶ 62.) The HR Director informed the City Attorney, Piedra, and the City Council that the Chief of Police should be fired for lying and Plaintiff should retain his position.  (*Compl.* ¶ 62.)  Despite the

11

recommendations of the HR Director and the CA, the City terminated Plaintiff effective April 15, 2021.  (*Compl.* ¶ 63.)

On March 24, 2021, Johnson issued another letter of intent to terminate, which containted the same reasons of dishonesty over a stored vehicle.  (*Compl.* ¶ 64.)  During the Skelly hearing, the HR Director told Plaintiff's representative that she was going to dismiss this claim and was going to resign due to Johnson's illegal actions towards plaintiff and hostility she had experienced first-hand. (*Compl.* ¶ 64.)  The HR Director resigned after complaining to Piedra regarding Johnson's conduct and discriminatory behavior. (*Compl.* ¶ 64.)  After the dismissal, Plaintiff filed another DFEH Complaint based on harm occurring on June 9, 2021.  (*Compl.* ¶ 64.)

Johnson improperly contacted the investigator regarding Thompson's complaint behind the HR Director's back, interviewing additional witnesses to elicit false and damaging information without giving plaintiff an opportunity to be heard regarding these new allegations.  (*Compl.* ¶ 65.)   Plaintiff was never given a copy of the Reprimand. (*Compl.* ¶ 65.)  He was given a defective notice related to his administrative leave as he was not given the reasons he was placed on leave. (*Compl.* ¶ 65.)  Further, Defendants attempted to discipline him twice for the same violation regarding dishonesty about a stored vehicle which had no basis in fact.  (*Compl.* ¶ 66.)  Plaintiff did not receive an impartial investigation regarding his claims of retaliation and officer safety violations regarding lack of Covid-19 precautions.  (*Compl.* ¶ 66.)  Defendants failed to provide an independent investigator to investigate his claims as opposed to the same investigator who was being directed by Johnson in a blatant attempt to trump up baseless charges to terminate Plaintiff.  (*Compl.* ¶ 65.)  As to the Skelly process, the HR Director, who had never been involved in the process, was under order to terminate plaintiff despite her objections to the City Manager, City Attorney and City Council that the Chief was lying and it was the Chief who should have been fired.  (*Compl.* ¶ 66.)  Therefore, the Skelly process was tainted and the Chief of Police, Johnson, and Piedra were integral in the discharge of plaintiff and the violation of his due process to a fair and impartial hearing.

12

1  (*Compl.* ¶ 66.)  Defendants, and each of them and/or their agents/employees supervised,
2  authorized, condoned and ratified the unlawful conduct of Defendant Johnson.  (*Compl.* ¶
3  67.)

4

5  **II.   LEGAL STANDARD**

6      Federal Rule of Civil Procedure 12(b)(6) allows a defendant to file a motion to
7  dismiss for failing "to state a claim upon which relief can be granted."  Fed.R.Civ.P.
8  12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency.  *See*
9  *N. Star Int'l v. Ariz. Corp. Comm'n.*, 720 F.2d 578, 581 (9th Cir. 1983).  A complaint
10 may be dismissed as a matter of law either for lack of a cognizable legal theory or for
11 insufficient facts under a cognizable theory.  *Balisteri v. Pacifica Police Dep't.*, 901 F.2d
12 696, 699 (9th Cir. 1990).  In ruling on the motion, a court must "accept all material
13 allegations of fact as true and construe the complaint in a light most favorable to the non-
14 moving party."  *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).

15     To survive a motion to dismiss, a complaint must contain "a short and plain
16 statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.
17 8(a)(2).  The Supreme Court has interpreted this rule to mean that "[f]actual allegations
18 must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v.*
19 *Twombly*, 550 U.S. 554, 555 (2007).  The allegations in the complaint must "contain
20 sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its
21 face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

22     Well-pled allegations in the complaint are assumed true, but a court is not required
23 to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable
24 inferences.  *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Sprewell v. Golden State*
25 *Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

26 //
27 //
28 //

22-cv-526-W-(KSC)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.   DISCUSSION

#### A.   First Cause of Action: Negligent Hiring, Supervision and Training.

Plaintiff brings this cause of action against Defendant City of El Centro, Defendant Piedra, and DOES 1 through 10.  Defendants move to dismiss this cause of action.  (*MTD* [Doc. 7] at 22.)   Defendants argue Plaintiff has failed to state a claim upon which relief can be granted because: 1) a public entity has no liability for this common law claim; 2) to the extent the statutes cited impose a mandatory duty, they were not intended to prevent the harm claimed by Plaintiff; 3) the statutes do not themselves create a private right of action; 4) Piedra was not Johnson's employer, and 5) Plaintiff has not identified any legal disqualification which would have prevented Johnson from being hired, even if city had complied with the purported mandatory duties.  (*Id.*)

#### 1.   Against the City

"In California, a governmental entity can only be sued in tort pursuant to an authorizing statute or enactment." *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 840 (9th Cir. 1996) (citing *Lopez v. S. Cal. Rapid Transit Dist.*, 40 Cal. 3d 780, 785 n.2 (1985); *Searcy v. Hemet Unified Sch. Dist.*, 177 Cal. App. 3d 792, 798 (1986)).  California law is clear that direct liability of a public entity "must be based on a specific statute declaring [the public entity] to be liable, or at least creating some specific duty of care[.]" *de Villers v. County of San Diego*, 156 Cal. App. 4th 238, 251.

California courts have held that a public entity cannot be held directly liable for the negligent hiring, retention, or supervision of police officers or other public employees because there is no statutory authority for imposing such liability.  *See Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1112-13 (2004) (holding that no "statutory basis [exists] either declaring [the city] directly liable under the circumstances of this case or, at least, one creating a specific duty of care" and reversing a judgment finding a California city and its police chief directly liable for negligence in the selection, training, retention, supervision, and discipline of police officers).  Under California law, "a direct

14

claim against a governmental entity asserting negligent hiring and supervision, when not grounded in the breach of a statutorily imposed duty owed by the entity to the injured party, may not be maintained." *de Villers*, 156 Cal. App. 4th at 255-56.

Applying California law, the Ninth Circuit and district courts have repeatedly held that a public entity cannot be directly liable for negligent hiring, retention, or supervision. *See Blair v. City of Pomona*, 223 F.3d 1074, 1076, 1079, 1081 (9th Cir. 2000) (affirming dismissal of a California state law claim for negligent supervision against a California city on the grounds that the California Government Code does not create such a cause of action against a public entity); *Heflin v. County of Los Angeles*, 438 Fed. Appx. 596, 597, 2011 WL 2412582, at *1 (9th Cir. Jun. 16, 2011) (affirming the dismissal of a claim against a California county on the ground that the county was not directly liable for its negligent hiring and supervision of a deputy sheriff who allegedly assaulted the plaintiff and explaining that the plaintiff "points to no statutory language supporting a negligent hiring or supervision claim against a public entity").

Plaintiff argues that the City is directly liable based on a breach of a mandatory duty, citing Cal. Gov. Code § 815.6.  (*Opp. to MTD* [Doc. 12] at 11.)  Section 815.6 provides that "[w]here a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."  CAL. GOV. CODE § 815.6.

Though § 815.6 may provide the basis for a separate cause of action for violation of a mandatory duty, it does not provide a basis for direct liability for negligent hiring, supervision and training against the City.  *See de Villers*, 156 Cal. App. 4th at 256 (holding that a direct claim against a governmental entity for negligent hiring and supervision "may not be maintained" and analyzing the breach of a mandatory duty as a separate claim). As explained above, a public entity can be held directly liable for negligence in California only if liability is based on a specific statute declaring them to be

15

liable or creating some specific duty of care.  *See Munoz*, 120 Cal.App.4th at 1112-13.

Section 815.6 provides that a public entity may be liable for failing to discharge a

mandatory duty, but it does not declare that a public entity can be liable for negligent

hiring or supervision.

Because a cause of action for direct liability for negligent hiring, supervision and

training cannot be maintained against a public entity under California law, the Complaint

fails to state a claim for this cause of action.  Accordingly, the Court will **DISMISS**

Plaintiff's first cause of action against the City **WITHOUT PREJUDICE**.

### 2.    Against Piedra

Defendants argue that Piedra cannot be liable for negligent hiring, supervision and

training because "she is not Johnson or plaintiff's employer."  (*MTD* at 28.)  But the

Complaint alleges that Piedra was Johnson's supervisor, failed to perform a mandatory

POST background check on Johnson, and owed a duty of care to the City's employees

(which includes Plaintiff).  Plaintiff alleges that Piedra "was at all times relevant the City

Manager for the City of El Centro" (*Compl.* ¶ 4), had "official policy-making authority

over actions such as the ones at issue in this Complaint" (*Id.*), and was "responsible for

the hiring, supervision and control of [the City's] employees . . . including . . . Defendant

Brian Johnson" (*Compl.* ¶ 69).

The California Supreme Court has recognized that a supervisor may be liable for

negligent hiring and supervision.  *See C.A. v. William S. Hart Union  High School Dist.*,

53 Cal.4th 861, 875 (2012) (holding that "public school administrators and supervisors

may be held legally responsible for their negligence in hiring and retaining . . . school

staff").  Accordingly, at this stage in the litigation, the Court finds Plaintiff has

sufficiently stated a negligence claim against Piedra for negligent hiring, supervision and

training of Johnson.

Defendants' motion to dismiss this claim as to Piedra is therefore **DENIED**.

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.**      **Sixth Cause of Action: Violation of Statutory Duty Pursuant to California Labor Code § 6310 and Seventh Cause of Action: Violation of California Labor Code § 1102.5.**

As to the sixth and seventh causes of action, Defendant argues that they should be dismissed because Plaintiff did not satisfy the government claim requirements that are conditions precedent to bringing a civil action.  (*MTD* at 29; *see* CAL. GOV. CODE §§ 945.4, 910.) The Court disagrees.

Section 945.4 simply states that no action may be commenced unless a claim which satisfies § 910 has been submitted and denied.  CAL. GOV. CODE § 945.4.  Section 910 prescribes the information that the claim must contain. The statute requires that the claimant set forth: "(c) The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted. [¶] (d) A general description of the ... injury, damage or loss incurred.... [¶] (e) The name or names of the public employee or employees causing the injury ... if known."  CAL. GOV. CODE § 910.  Defendant does not identify, and the Court did not find, any authority suggesting that the claim must comply with formal pleading standards.  According to the California Supreme Court, the purpose of a § 910 claim is to present sufficient detail "to reasonably enable the public entity to make an adequate investigation of the merits of the claim and to settle it without the expense of a lawsuit."  *City of San Jose v. Superior Court*, 12 Cal.3d 447, 456 (1974).

The Court finds that Plaintiff's claim meets the minimum requirements of Section 910 and presents sufficient detail to have enabled the City to make an adequate investigation of the merits of the claim.  It sets forth the date, place, and circumstances of the incident; it provides a "general description of the . . . injury, damage, or loss incurred[;]" and it provides the names of the public employees causing the injury.  (*See Exhibit 4 to Compl.*)  Accordingly, Defendant's motion as to the sixth and seventh causes of action is **DENIED.**

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.      Eighth Cause of Action: Violation of 42 U.S.C. § 1983 First Amendment Retaliation

Defendants argue that the eighth cause of action should be dismissed because Plaintiff's allegations do not state a claim for § 1983 First Amendment Retaliation against the City. (*MTD* at 31.) Defendants state that the Complaint's allegations as to this cause of action are directed against the individual defendants, not the City. The Complaint shows as much, and Plaintiff does not argue otherwise. (*See Compl.* at ¶¶ 117-125; *Opp. to MTD* at 18-19.) Instead, Plaintiff seems to argue that the City is liable for the other defendants' conduct by way of a ratification by a final policymaker theory under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). (*See Opp. to MTD* at 18.)

Plaintiff is correct that Monell liability can be made through the actions of a final policymaker. Monell liability can be demonstrated through "decisions of a final policy-making official who commits the federal law violation himself or ratifies the unlawful act of a delegate." *Lytle v. Carl*, 382 F.3d 978, 986 (9th Cir. 2004).

To impose liability based on this theory, a plaintiff must establish that a municipal employee bearing "final policy-making" authority ratified the violation of Plaintiff's constitutional rights with actual knowledge of the violation. *Christie v. Iopa*, 176 F.3d. 1231, 1239 (9th Cir. 1999). In determining whether an official is a final policymaker, "courts consider whether the official's discretionary decisions are 'constrained by policies not of that official's making' and whether the official's decisions are 'subject to review by the municipality's authorized policymakers.'" *Id.* at 1236–37.

"[W]hether a particular official has final policy-making authority is a question of state law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Courts, therefore, look to applicable state laws and regulations to determine if the defendant is a final policymaker. *See Lytle*, 382 F. 3d 978 (examining school district regulations to determine if assistant superintendent was the final policymaker with respect to employment-related decisions). Additionally, "[a]uthority to make municipal policy may

be granted directly by a legislative enactment or may be delegated by an official who possesses such authority . . .." *Pembaur*, 475 U.S. at 483.

The Complaint does not state a claim for Monell liability based on ratification of a final policymaker. Though Plaintiff's opposition to the motion to dismiss at times discusses Piedra's policymaking authority as city manager, the Complaint does not allege sufficient facts as to Piedra's or Johnson's final policy-making authority. Furthermore, the Complaint fails to allege facts as to whether Piedra had actual knowledge of the alleged violation of constitutional rights or whether Piedra "approve[d] the subordinate's decision and the basis for it." *Christie*, 176 F.3d at 1239.

Because the Complaint is devoid of factual allegations as to several necessary elements of a claim for Monell liability based on ratification by a final policymaker, this cause of action is **DISMISSED WITHOUT PREJUDICE.**

### D.   Ninth Cause of Action: Violation of 42 U.S.C. § 1983 - Due Process

Defendants argue that Plaintiff's ninth cause of action should be dismissed because Plaintiff failed to seek writ relief pursuant to Cal. Civ. Pro. § 1094.5. (*MTD* at 31.)

A § 1983 claim is precluded where a plaintiff has failed to exhaust judicial remedies in state court. *Doe v. Regents of the Univ. of California*, 891 F.3d 1147, 1154 (9th Cir. 2018). "Under federal common law, federal courts accord preclusive effect to state administrative proceedings that meet the fairness requirements of *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S. Ct. 1545, 16 L.Ed.2d 642 (1966)." *Id.* This Court therefore must "give preclusive effect to a state administrative decision if the California courts would do so." *Id.* at 1155. In California, .... [a] party must exhaust judicial remedies by filing a § 1094.5 petition, the exclusive and 'established process for judicial review' of an agency decision." *Id.* at 1155 (quoting *Johnson v. City of Loma Linda*, 24 Cal. 4th 61, 70 (2000)). To exhaust judicial remedies, a party must file a petition for a writ of administrative mandate under California Code of Civil Procedure section 1094.5. *Id.* An administrative decision that is entitled to preclusive effect under these principles will bar federal claims, including § 1983 claims, that fall within that

19

decision's preclusive scope.  *Id.* at 1154-55.  A municipality's disciplinary decision is "the sort of 'adjudicatory, quasi-judicial decision' that is subject to the judicial exhaustion requirement."  *Id.* (quoting *Y.K.A. Indus., Inc. v. Redev. Agency of San Jose*, 174 Cal. App. 4th 339, 361 (2009).

Plaintiff does not allege or argue that he did file a writ pursuant to Cal. Civ. Pro. § 1094.5.  To exhaust his judicial remedies, Plaintiff was required to file a petition of for a writ of administrative mandate under California Code of Civil Procedure section 1094.5 challenging his termination.  Failure to do so bars a civil action challenging the termination decision.  *See Regents of the Univ. of California*, 891 F.3d at 1154; *Loera v. Cty. of Imperial*, 256 F. App'x 961, 963 (9th Cir. 2007) (failure to seek state judicial review of the administrative board's decision by administrative mandamus action precluded plaintiff from relitigating issues in his Section 1983 and state law claims).  Since the Complaint fails to allege that Plaintiff filed a petition for a writ of administrative mandate under California Code of Civil Procedure section 1094.5, Defendant's motion to dismiss the ninth cause of action is granted.  Plaintiff's 42 U.S.C. § 1983 cause of action is **DISMISSED WITHOUT PREJUDICE**.

Since the Court dismisses this cause of action based on Plaintiff's failure to exhaust judicial remedies, the Court does not reach Defendant's arguments as to the Fifth Amendment and violation of state law.

## IV.   CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss [Doc. 7] as to the first cause of action against the City **WITH LEAVE TO AMEND** but **DENIES** the motion to dismiss the first cause of action against Piedra.  Additionally, the Court **DENIES** Defendants' motion to dismiss the sixth and seventh causes of action, **GRANTS** Defendants' motion to dismiss the eighth cause of action **WITH LEAVE TO AMEND**, and **GRANTS** Defendants' motion to dismiss the ninth cause of action **WITH**

20

1  **LEAVE TO AMEND**.  If Plaintiff elects to file an amended complaint, it must be filed

2  on or before **<u>November 11, 2022</u>**.

3          **IT IS SO ORDERED.**

4  Dated:  October 25, 2022

5

6                                          Hon. Thomas J. Whelan

7                                          United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21

22-cv-526-W-(KSC)